



FILED

Apr 16 2025, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

### TKG Associates, LLC,

*Appellant-Defendant/Counter-Plaintiff*

v.

### MBG Monmouth, LLC, MBG Aurora, LLC, MBG Joliet, LLC, and MBG MKE, LLC,

*Appellees-Plaintiffs/Counter-Defendants*

---

April 16, 2025

Court of Appeals Case No.
24A-PL-1270

Appeal from the Marion Superior Court

The Honorable Christina R. Klineman, Judge

Trial Court Cause No.
49D01-2204-PL-13624

---

**Opinion by Judge Tavitas**
Judges May and DeBoer concur.

**Tavitas, Judge.**

## Case Summary

[1] TKG Associates, LLC ("Buyer") appeals the trial court's judgment in favor of MBG Monmouth, LLC; MBG Aurora, LLC; MBG Joliet, LLC; and MBG MKE, LLC (collectively, "Seller"). Buyer and Seller entered into an agreement for the purchase of four Sky Zone franchises, and a dispute arose during the due diligence period regarding the accuracy of information provided by Seller. Ultimately, the purchase was not completed, and Seller filed a complaint seeking to retain Buyer's deposit pursuant to the parties' agreement. The trial court entered judgment for Seller, and Buyer appeals. Given the undisputed evidence that Seller was the first to materially breach the agreement, we agree with Buyer that the trial court's judgment is clearly erroneous. Accordingly, we reverse and remand with instructions for the trial court to vacate the judgment for Seller, enter judgment for Buyer on its breach of contract counterclaim, and hold a hearing to determine Buyer's damages in a manner consistent with this opinion.

## Issues

[2] Buyer raises several issues, but we address one dispositive issue, which we restate as whether the trial court's findings of fact and conclusions thereon are clearly erroneous.

## Facts

Buyer is a limited liability company operated by Ajay Keshap and his family. Seller consists of several limited liability companies that own four Sky Zone franchises in Monmouth, New Jersey; Aurora, Illinois; Joliet, Illinois; and Greenfield, Wisconsin, and are operated by Barbara Glazer ("Glazer") and Mark Glazer.

On January 19, 2022, Buyer and Seller entered into an Asset Purchase Agreement ("Agreement") for the sale of the four Sky Zone franchise assets for a purchase price of $6,500,000. The purchase price was determined by the Seller's Earnings Before Interest Taxes Deductions and Appreciation ("EBITDA") multiplied by a valuation factor of 3.5 plus $800,000 for the sale of certain equipment. In negotiating the Agreement, Seller provided two spreadsheets, which represented an annualized EBITDA of $1,600,000. Buyer relied upon this data when entering into the Agreement.

The Agreement was drafted by Buyer and provided in relevant part:

> 1. [ ] Upon execution of this Agreement, Buyer shall deposit $25,000.00 (the "Deposit") with First American Title Insurance Company . . . . The Deposit shall be held in escrow and applied to the Purchase Price, in accordance with and subject to the terms and conditions of this Agreement.
>
> * * * * *
>
> 4. [ ] Buyer shall assume all obligations under the Leases related thereto; and, in the event that the lessor thereunder does not

release all personal guarantees related thereto, Buyer shall work to indemnify the individual(s) that have provided guarantees to support the lease obligations on a best effort basis only. Buyer shall assume all obligations under the Sky Zone franchise agreements related thereto.

5. Due Diligence. **Buyer shall have forty-five (45) days (the "Investigation Period") beginning on the date that it receives notice of Franchisor's waiver of the right of first refusal (as set forth in Paragraph 7.M) to conduct any due diligence activities and investigations. Seller shall supply all requested due diligence materials requested by Buyer within ten (10) days of execution of this Agreement.**

> a. Financial Investigation. The Buyer will be given the right to examine all records of income and expenses of the business ("Financial Investigation"), and this Agreement is subject to the Buyer's approval thereof. Buyer shall conduct its Financial Investigation during the Investigation Period. If Buyer, in its reasonable discretion, is not satisfied with the results of its Financial Investigation, Buyer shall have the right to terminate this Agreement by providing written notice to Seller[.]

> b. Lease Review. **Buyer shall have the right to review the Leases. This Agreement is subject to the Buyer's approval of such Leases within 30 days of receipt of such Leases and all addendums.** These leases will still need to be assigned to Buyer. The parties shall cooperate in obtaining the written consent of the landlord for each Lease prior to expiration of the Investigation Period. With respect to Buyer, Buyer shall present to lessor a commercially reasonable financial statement which demonstrates its capacity to fulfill the obligations under the Leases. With respect to Seller, Seller shall attempt to

obtain the release of each person currently guaranteeing Seller's obligations under the Leases. In the event that one or more lessors will not release such persons, then Seller shall fairly evaluate the prospects of Buyer fulfilling the obligations under the lease for the purpose of assuring and indemnifying the current guarantors with respect to such lease(s). Assignment expenses charged by each lessor in accordance with the terms of each lease shall be paid by the Seller.

6. Closing. Buyer is to take possession at the time that ownership is transferred to Buyer ("Closing"). Closing shall occur on or before March 31, 2022, on a best effort basis, as determined in the parties' reasonable discretion following completion of Buyer's investigation of the Business. **Buyer shall diligently investigate all matters relevant to its satisfaction of the conditions herein for Buyer's benefit and shall complete such investigation on or before February 28, 2022 ("Investigation period"). Within five (5) days following the expiration of the Investigation Period, Buyer shall notify Seller and Escrow Agent in writing that all conditions for Buyer's benefit herein have been satisfied or waived.** Failure by Buyer to provide such notice, shall be deemed a default under this Agreement, and this transaction shall be automatically cancelled and Seller shall have the right to pursue any damages pursuant to Paragraph 10 of this Agreement. Personal property taxes, real property taxes, CAM (if applicable), utilities, and rent are to be prorated to the Closing date.

7. Conditions to Closing. THIS AGREEMENT IS MADE SUBJECT TO THE FOLLOWING CONDITIONS and in the event either (a) the Seller does not complete the following conditions or (b) Buyer timely disapproves any of the following conditions for which Buyer is granted approval rights and Seller fails to cure such conditions, this offer is shall [sic] terminate, and the Deposit shall be returned to Buyer less escrow fees (if any).

* * * * *

S.  Closing shall occur not later than March 31, 2022, on a
best effort basis.

* * * * *

10.  Default.  If Buyer breaches this Agreement, Seller's sole and
exclusive remedy shall be to terminate this Agreement and
receive the Deposit as liquidated damages.

In the event of default by Seller under the terms of this
Agreement, at Buyer's option, Buyer may either (i) terminate this
Agreement by delivery of written notice of termination to Seller,
whereupon Buyer and Seller shall each be released from all
liability hereunder (except for those provisions which recite that
they survive termination) and the Deposit shall be returned to
Buyer and Seller shall reimburse Buyer for all of Buyer's
reasonable out of pocket expenses incurred in connection with
this Agreement and Buyer's due diligence and reasonable
attorneys' fees, to the maximum extent of Ten Thousand Dollars
($10,000) or (ii) Buyer shall have the right to specific
performance and may close the transaction and/or pursue Seller
for its damages resulting from Seller's breach.

* * * * *

12.  Miscellaneous.

* * * * *

C.  In any action or proceeding arising out of this
Agreement, the prevailing party shall be entitled to
reasonable attorney's fees and costs.

> This document contains the entire agreement between the Buyer and the Seller herein and there are no oral agreements or understandings not herein contained. Any modification hereof must be in writing and signed by both Buyer and Seller.

Ex. Vol. I pp. 5-9 (emphasis added).

Buyer received the notice of the Franchisor's waiver of their right of first refusal on January 19, 2022. Under Paragraph 5 of the Agreement, the forty-five day Investigation Period, thus, was set to expire on March 5, 2022. Under Paragraph 6, however, the Investigation Period was set to expire on February 28, 2022, with the Buyer having five additional days (March 5, 2022) to "notify Seller and Escrow Agent in writing that all conditions for Buyer's benefit herein have been satisfied or waived." *Id.* at 6.

On January 26, 2022, Buyer gave Seller an initial due diligence list, and Glazer began uploading the documents into a shared Google drive created by Buyer. Glazer was asked to provide information on "leases, assignments, amendments, guarantees, franchise agreements, park improvement" and other information. Tr. Vol. II p. 54; Ex. Vol. I p. 11. In response, Glazer uploaded documents to the Google drive. Regarding lease "[a]ddendums per location," Glazer responded, "N/A." Ex. Vol. I p. 13. Regarding a "[b]reakdown of any rent abatements or deferments per location per month 2020-present," Glazer responded, "N/A." *Id.*

The parties continued performing due diligence, and Buyer and Seller together visited all of the parks from February 22 to February 24, 2022. During the visit,

Buyer realized that Seller received rent abatements, extensions, and deferments due to the Covid-19 pandemic, which resulted in an inflated EBITDA and inflated business valuation.

[9]     On February 28, 2022, Buyer asked for additional data, including information on the rent abatements and deferments for each park. Later that day, Seller provided Buyer with a document entitled "Lease Amendment Agreements." *Id.* at 69. The one-page document summarized rent abatements and deferments for each of the four parks and outstanding rents that were still due. In the document, Seller stated that it would either "take on the debt in the close of the sale" or "pay all outstanding rent at the close of the sale." Ex. Vol. I p. 69. On March 1, 2022, Buyer asked Seller to confirm "which of these rent abatement/deferments were formalized in an amendment versus verbal." *Id.* at 71. Seller then informed Buyer that the Aurora and Greenfield locations had "[f]ormal legal agreement[s]" and that the Joliet and Ocean locations had "[e]mail/handshake correspondence." *Id.* at 70.

[10]    On March 2, 2022, Seller sent an email to Buyer as follows:

> The 45 day due diligence period after the Circus Trix ROFR will expire on Monday March 7th according to our contract. I hope we can provide all your answers by then so that you can make a decision and we can move forward. Let me know as soon as possible your other questions and I will expedite the answers so you have all the information you need.

*Id.* at 19. Buyer, however, continued to ask for clarification and documentation of several items, and Seller continued to respond with clarifications.

On March 7, 2022, Buyer sent Seller a written request of due diligence extension. When Seller questioned the request, Buyer informed Seller that the visit to the parks "brought up a lot of new questions," Buyer needed to "dive deep into the data again," and Buyer needed "more time to review." *Id.* at 22.

After a meeting between the parties, on March 11, Seller sent an email to Buyer as follows:

> Thank you for the conversation. We understand your point of view better now and will work to making [sic] the agreement happen on both our timelines. . . . We look forward to a productive conversation next Wednesday March 16th. . . . If you are interested in proceeding, we would like to establish a realistic timeline to close and understand the remaining open items to achieve that timeline.

*Id.* at 79.

The parties then met on March 16 to discuss "outstanding questions about the financials" among other items. *Id.* at 25. The parties, however, disagree as to the substance and outcome of this conversation. Buyer claims that it was still interested in moving forward with the purchase but on different terms given new information Seller had provided. Seller claims that Buyer was unwilling to move forward with closing. The parties had no conversations between March 16 and March 25, 2022. On March 25, 2022, Seller's attorney sent Buyer a letter asserting that the Agreement "has terminated" because Buyer did not provide the notice required by Section 6 of the Agreement. *Id.* at 27. Seller also

claimed that it was entitled to the $25,000 deposit. Seller later sold the businesses to other buyers for a total of $8.2 million.

[14] In April 2022, Seller filed a complaint against Buyer for breach of contract and declaratory relief and requested damages of the $25,000 deposit, attorney fees, and interest. Seller alleged that it "performed all of its obligations under the [Agreement]", that Buyer failed to provide written notice after the Investigation Period, and that Seller terminated the Agreement after Buyer's "breach." Appellee's App. Vol. II p. 5.

[15] Buyer filed its answer and affirmative defenses, which it later amended, and included the following claims: (1) Seller's claims are barred by waiver; (2) Seller's claims are barred by estoppel; (3) Seller's claims are barred because Seller "agreed to extend the due diligence period, [Buyer] relied on that promise, and [Seller] later breached the promise"; (4) Seller's claims are barred because Seller "made material misrepresentations about financial data provided to [Buyer], constituting fraud, entitling [Buyer] to damages and the right of cancellation"; and (5) Seller's claims are barred "because [Seller] first breached and defaulted under the Asset Purchase Agreement." *Id.* at 15-16; 30-31.

[16] Buyer also filed a counterclaim for breach of contract and declaratory judgment. Buyer alleged that Seller: (1) failed to honor an agreed upon extension of the investigation period; (2) failed or refused to provide complete and accurate financial data; and (3) failed to engage the landlords in the

required negotiations for lease assignments or for releases of personal guarantees.

[17] Seller filed a motion for summary judgment, and Buyer filed a cross motion for summary judgment. The trial court denied the motions, however, and found:

> "When one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date.["] *Hussain v. Salin Bank & Tr. Co.*, 143 N.E.3d 322, 331 (Ind. Ct. App. 2020)[, *trans. denied*]. Whether a party has materially breached an agreement is a question of fact and is dependent upon several factors . . . .
>
> [Seller] contends that it provided all of the documents and data requested by [Buyer], and [Buyer] asserts that [Seller] failed to provide complete and accurate data and documents. Whether [Seller] provided all of the documents and data requested by [Buyer] as part of its due diligence investigation is a genuine issue of material fact. This factual issue is a threshold question that prevents the Court from going on to consider the issues related to the alleged agreed modification of the contract and/or promise to extend the Investigation Period, which issues involve questions of fact, themselves. Based on the designated evidence, the Court finds that genuine issues of material fact exist that preclude the entry of summary judgment in favor of either party. Accordingly, the cross-motions for summary judgment are denied.

January 19, 2023 Order on Summary Judgment Motions, Cause No. 49D01-2204-PL-13624.[1]

[18] A bench trial was held in March 2024. During closing arguments, Buyer argued, among other things, that Seller "breached the contract" when Seller failed to inform Buyer of the "lease deferments" until February 28, 2022, and failed to give Buyer thirty days to review the leases. Tr. Vol. II pp. 211-12.

[19] On May 9, 2024, the trial court entered findings of fact and conclusions thereon and granted judgment in favor of Seller. The trial court found, in relevant part:

> 7. [Seller] provided two Excel spreadsheets, Exhibits AA and BB, by which [Seller] represented annualized EBITDA of $1,600,000.00, and [Buyer] relied on the data reported in these spreadsheets when it entered into the Asset Purchase Agreement.
>
> * * * * *
>
> 20. During the Investigation Period, [Buyer] discovered that Exhibits AA and BB were not a fully accurate representation of the financial condition of [Seller]'s business because, among other things, the financial records did not reflect lease abatements and deferrals made by [Seller]'s landlords, which means that [Seller]'s actual operating costs and debts were understated and the EBITDA was overstated. [Buyer] also learned that [Seller] had agreed with their landlords to pay certain debts owed under the lease agreements, after the leases were to be assigned by [Seller] to [Buyer]. [Buyer] learned of the verbal lease

---

[1] The trial court's summary judgment order was not in the materials provided to us. We took judicial notice of the trial court record for purposes of this appeal pursuant to Indiana Evidence Rule 201.

amendments, lease abatements, and lease deferrals on February 28, 2022, when [Seller] emailed [Buyer] a document titled "Lease Amendment Agreements during 2000 20-2021 for Sky Zone [Seller] Parks." [Def.'s Ex. W].

\* \* \* \* \*

22. In an email to [Buyer], [Seller] claimed that they would take responsibility for the unpaid back rent owed to their landlords. However, [Seller] failed to engage their landlords in negotiations required for the assignment of leases or for releases of personal guarantees of the then existing leases, and instead, asked [Buyer] to contact the landlords directly.

23. [Buyer] repeatedly asked [Seller] to confirm the franchise agreement that [Buyer] was acquiring and whether the SKY Zone franchisor would assign the existing franchising agreements at no additional cost to [Buyer], pursuant to Paragraphs 4 and 7(O) of the Asset Purchase Agreement. However, [Seller] failed to secure the franchisor's commitment to said assignment at no additional cost to [Buyer].

\* \* \* \* \*

28. Pursuant to the express language in Paragraph 6, [Buyer] was required to provide notice in writing of all conditions satisfied or waived to [Seller] and the Escrow Agent by March 5, 2022 (which was five days after February 28, 2022, which is listed in Paragraph 6 of the Asset Purchase Agreement, under the heading "Closing"). [Pl. Ex. 1].

29. On March 5, 2022, [Buyer] did not notify [Seller] or the Escrow Agent of any conditions for its benefit that were satisfied or waived.

* * * * *

31. Neither Barbara Glazer nor Mark Glazer agreed to extend the due diligence period.

* * * * *

47. The Court finds that [Buyer] breached the Asset Purchase Agreement by failing to provide written notice of all conditions that were satisfied or waived by March 5, 2022, the deadline provided in the parties' contract.

* * * * *

53. [Buyer] argued that there was a failure of conditions precedent which released it of the obligation to conclude due diligence in the contractual time frame. However, the conditions precedent cited by [Buyer] are conditions precedent to closing, not to due diligence being completed. Under contract law, a condition precedent is a condition that must be performed before the agreement of the parties becomes a binding contract, or that must be fulfilled before the duty to perform a specific obligation arises. *McGraw v. Marchioli*, 812 N.E.2d 1154, 1157 (Ind. Ct. App. 2004). Again, the Court finds that the conditions precedent cited by [Buyer] were conditions precedent to closing and not to due diligence.

54. [Seller] presented evidence that it supplied all requested due diligence documents to [Buyer] as early as January 26, 2022, upon receipt of the initial due diligence list. [Buyer] had the ability to investigate the business and its expenses but failed to do so by the close of the Investigation Period. [Buyer] did not present any evidence of due diligence materials that it requested and did not receive. On the contrary, all requested due diligence

documents were uploaded to the shared Google Drive within ten (10) days of its request.

55. Although [Buyer] had concerns about the data it was provided, [Buyer] had the right to terminate the Agreement by providing written notice to [Seller] under Paragraph 5(a). [Buyer] did not provide such notice.

\* \* \* \* \*

63. There is insufficient evidence for the Court to conclude that [Seller] knew that the materials it presented to [Buyer] prior to the parties entering the Asset Purchase Agreement were inaccurate or incomplete or that [Seller] acted in bad faith. The Court also finds that [Buyer] has not met its burden of proving that that [Seller] had superior knowledge that [Buyer] did not have. [Buyer] was represented by sophisticated business people and was able to investigate all of [Seller]'s finances and obtain all of the relevant financial information it needed. As the Court has already stated, if and when [Buyer] discovered that the financial information provided by [Seller] was inaccurate, or if it was "not satisfied with the results of its Financial Investigation," [Buyer] could have terminated the Asset Purchase Agreement. However, [Buyer] did not do so.

Appellant's App. Vol. II pp. 19-30 (footnote omitted). The trial court concluded that Seller was entitled to the deposit as liquidated damages because Buyer failed to provide a termination notice under the Agreement, interest, and reasonable attorney fees pursuant to the Agreement. Buyer now appeals.

## Discussion and Decision

[20] Buyer challenges the trial court's judgment in favor of Seller. Buyer argues, in part, that the trial court's findings regarding the failure of conditions precedent are clearly erroneous.[2] We agree that, given the undisputed evidence, the trial court's findings of fact and conclusions thereon are clearly erroneous.

[21] Here, the trial court entered findings of fact and conclusions thereon sua sponte. "Pursuant to Indiana Trial Rule 52(A), a court on appeal will 'not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016) (quoting *D.C. v. J.A.C.*, 977 N.E.2d 951, 953 (Ind. 2012)). If a trial court enters findings sua sponte, we review the issues covered by the findings with a two-tiered standard of review: (1) whether the evidence supports the findings, (2) and whether the findings support the judgment. *Id.* "Any issue not covered by the findings is reviewed under the general judgment standard, meaning a reviewing court should affirm based on any legal theory supported by the evidence." *Id.*

[22] "Findings of fact are clearly erroneous when the record contains no facts to support them, and a judgment is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies an

---

[2] Buyer also argues that the trial court's findings regarding fraud, constructive fraud, liquidated damages, and mitigation of damages are clearly erroneous. Given our conclusion regarding the breach of contract and condition precedent findings, we need not address these arguments.

incorrect legal standard." *Perrill v. Perrill*, 126 N.E.3d 834, 840 (Ind. Ct. App. 2019) (quoting *Carmer v. Carmer*, 45 N.E.3d 512, 516-17 (Ind. Ct. App. 2015)), *trans. denied*. Although we review findings under the clearly erroneous standard, we review conclusions of law de novo. *Id.*

[23] Further, the parties' arguments require that we interpret the Agreement.

> In interpreting a contract, we ascertain the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties. We look at the contract as a whole . . . and we accept an interpretation of the contract that harmonizes all its provisions. A contract's clear and unambiguous language is given its ordinary meaning. A contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless.

*Ryan v. TCI Architects/Eng'rs/Cont'rs, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017) (internal citations omitted). We review questions of contract interpretation de novo. *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 206 (Ind. 2022).

[24] The parties brought breach of contract claims against each other. In general, "[t]o prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). Buyer claimed in its complaint that Seller breached the Agreement, in part, by failing to provide accurate information during the Investigation Period. During the summary judgment proceedings, the trial court analyzed

the issue as whether a material breach occurred, but in its order after the bench trial, the trial court analyzed the issue as whether conditions precedent were satisfied. The trial court concluded that the issues raised by Buyer were conditions precedent to closing and that Buyer could have terminated the Agreement given the concerns uncovered during the Investigation Period.

[25] "It is well established that '[w]hen one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date.'" *A House Mechanics, Inc. v. Massey*, 124 N.E.3d 1257, 1262 (Ind. Ct. App. 2019) (quoting *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011)). "A material breach is often described as one that goes to the 'heart of the contract.'" *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 158-59 (Ind. 2016) (quoting *Collins v. McKinney,* 871 N.E.2d 363, 370 (Ind. Ct. App. 2007)).

[26] Under the common law, when determining whether a breach is material, Indiana courts generally apply the factors articulated in the Restatement (Second) of Contracts § 241 (1981):

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Int'l Bus. Machines*, 51 N.E.3d at 160 (citing *Collins,* 871 N.E.2d at 375).

[27] The trial court, however, did not analyze whether Seller materially breached the Agreement. Rather, the trial court found that the issues raised by Buyer were merely conditions precedent to closing and that Buyer could have terminated the Agreement during the Investigation Period but failed to do so. "A condition precedent is a condition that must be performed before the agreement of the parties becomes binding, or a condition that must be fulfilled before the duty to perform a specific obligation arises." *Town of Plainfield v. Paden Eng'g Co.*, 943 N.E.2d 904, 909 (Ind. Ct. App. 2011), *trans. denied*. A party, however, "may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure." *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. Ct. App. 2000), *trans. denied*.

[28] Here, under the Due Diligence section (Section 5), the Agreement required Seller to provide "all requested due diligence materials requested by Buyer within ten (10) days of execution of this Agreement," which was executed on

January 19, 2022. Ex. Vol. I p. 5. Accordingly, Seller was required to provide all due diligence materials by January 29, 2022. The Due Diligence section also gave Buyer "the right to review the Leases" and provided that the Agreement "is subject to the Buyer's approval of such Leases within 30 days of receipt of such Leases and all addendums." *Id.* at 6. Again, the Investigation Period was set to expire either on: (1) March 5, 2022; or (2) February 28, 2022, with the Buyer having five additional days (March 5, 2022) to "notify Seller and Escrow Agent in writing that all conditions for Buyer's benefit herein have been satisfied or waived." *Id.*

[29] Buyer promptly requested information on "leases, assignments, amendments, guarantees, franchise agreements, park improvement" and other information. Tr. Vol. II p. 54; Ex. Vol. I p. 11. In response, Glazer uploaded documents to the Google drive created by Buyer. It is undisputed that, regarding lease "[a]ddendums per location," Glazer responded, "N/A." Ex. Vol. I p. 13. Further, regarding a "[b]reakdown of any rent abatements or deferments per location per month 2020-present," Glazer responded, "N/A." *Id.*

[30] Although Seller initially denied any lease addendums or rent abatements or deferments, on February 28, 2022, after Buyer discovered that certain lease addendums and rent abatements or deferments existed and requested information thereon, Seller sent Buyer a summary of "Lease Amendment Agreements," which summarized the existing rent abatements and deferments. *Id.* at 69. On March 1, 2022, Seller told Buyer that formal legal agreements existed regarding two of the parks for the rent abatement/deferments and the

others were memorialized with "[e]mail/handshake correspondence." *Id.* at 70.

[31] Seller, thus, did not provide Buyer with the requested due diligence materials within ten days as required by the Agreement, and Seller affirmatively denied the existence of documents that, in fact, did exist. Although Seller did provide information on the lease addendums on February 28, 2022, Buyer did not receive thirty days to review the lease addendums as required by the Agreement.

[32] The trial court's findings on this issue are conflicting. Finding No. 20 detailed that Buyer did not learn of the lease amendments, lease abatements, and lease deferrals until February 28, 2022, and that the financial records provided to Buyer understated the actual operating costs and debts and overstated the EBITDA. In Finding No. 54, however, the trial court found that Seller "supplied all requested due diligence documents," that Buyer "did not present any evidence of due diligence materials that it requested and did not receive," and that "all requested due diligence documents were uploaded to the shared Google Drive within ten (10) days of its request." Appellant's App. Vol. II p. 28-29. Given the undisputed evidence, the trial court's finding that Seller supplied all requested due diligence materials in a timely manner is clearly erroneous.

[33] The rent abatements/deferments resulted in an inflated EBITDA and inflated business valuation. The leases and EBITDA calculations went to the heart of

the Agreement, and we conclude that Seller's breach was material. Although the Agreement required Buyer to provide a notice "in writing that all conditions for Buyer's benefit herein have been satisfied or waived" and failure to provide the notice was a default, Seller had already materially breached the Agreement. Ex. Vol. I p. 6. As first to breach the Agreement, Seller could not "seek to enforce the provisions of the contract against [Buyer] if [Buyer] breache[d] the contract at a later date." *A House Mechanics, Inc.*, 124 N.E.3d at 1262. Buyer's failure to provide the notice after the Investigation Period does not excuse Seller's earlier material breach.[3]

[34] The trial court rejected Buyer's argument because it found that "the conditions precedent cited by [Buyer] are conditions precedent to closing, not to due diligence being completed," but we disagree. Appellant's App. Vol. II p. 28. Under the Agreement, Seller was required to provide this documentation regarding the leases during the investigation period, not as a condition precedent to closing. Accordingly, the trial court's finding regarding conditions precedent is clearly erroneous.

[35] Because Seller was the first party to materially breach the Agreement, we vacate the trial court's judgment for Seller. Rather, Buyer is entitled to judgment in its

---

[3] We further note that the notice required Buyer to state that the conditions were "satisfied or waived." Ex. Vol. I p. 6. The Agreement did not explain Buyer's recourse if the conditions were not met. Regardless, Buyer did not wish to terminate the Agreement but continued to request more information and sought to renegotiate the purchase price given the updated documentation. Seller, not Buyer, ultimately terminated the Agreement. The trial court's findings to the contrary are not supported by the evidence and are clearly erroneous.

favor on its breach of contract counterclaim. We remand for the trial court to hold a hearing to determine Buyer's damages pursuant to Section 10 of the Agreement and attorney fees as the prevailing party pursuant to Section 12(C).

## Conclusion

The trial court's findings of fact and conclusions thereon are clearly erroneous because Seller was the first party to materially breach the Agreement. Accordingly, we reverse and remand with instructions for the trial court to vacate the judgment for Seller, enter judgment for Buyer on its breach of contract counterclaim, and hold a hearing to determine Buyer's damages in a manner consistent with this opinion.

Reversed and remanded.


May, J., and DeBoer, J., concur.


ATTORNEY FOR APPELLANT

Matthew A. Griffith
Griffith Xidias Law Group LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

John P. Higgins
Dominick D. Ellis
Stoll Keenon Ogden PLLC
Indianapolis, Indiana